Good morning, Your Honors, and may it please the Court, Deputy Attorney General Seth McCutcheon on behalf of the state. I intend on focusing my time on our appeal, but I'm happy to answer any of the Court's questions as to any of the claims. I'd like to reserve seven minutes of my time for rebuttal. The District Court erred when it concluded that the California Supreme Court had unreasonably denied Waidla's penalty-phase ineffective assistance claim. First, as to the good behavior in jail subclaim, the District Court recognized that the question of deficiency was a close call. On its face, this necessarily means that fair-minded jurists could disagree, and therefore the District Court was required to deny this subclaim under AEDPA. Regarding the background and upbringing claim, that claim fails because Waidla instructed trial counsel not to contact friends and family in Estonia. Under Shiro v. Landrigan, when a defendant objects to counsel pursuing a certain avenue of mitigation, as a matter of law, there can be no prejudice if counsel complies. This is pretty different from Landrigan, isn't it? I guess what I mean is the objection in Landrigan was far more vigorous than any objection that Mr. Waidla lodged here, wasn't it? I would agree it was more vigorous, but I think that Waidla's objection was also vigorous. Counsel stated in his declaration that he had numerous discussions and attempts to gain consent to contact these people, and the issue was never resolved. So Landrigan involved active interference with counsel's ability to investigate mitigation evidence. Do we have that here? Do we have active interference? And you say he was reluctant to have his family in Estonia talk to, but that was initially reluctant, and then later on things evolved in Estonia where the reasons for that reluctance, the stated reasons, would have dissipated. Well, a couple of responses. First, there's nothing in the record that shows that there was anything in Waidla's reluctance that evolved in both the trial counsel's declaration and in Waidla's declaration. There's no suggestion that he changed his mind as to whether he wanted trial counsel to contact friends and family. As far as how things evolved in Estonia, it wasn't until after Waidla's trial that Estonia gained independence. Right, but it was loosening up. I mean, there was, and he received word, I think this was in counsel's 1999 declaration, he received word that his family had heard about his alleged crime and that they knew that he was in the United States. And that's true, and I think that goes to one of the reasons that Waidla was reluctant for trial counsel to contact them, but the other reason, one that there is nothing to suggest had been alleviated, was the risk of reprisal that the family faced from KGB had they assisted somebody who had served in the Soviet Army and come to America. So that risk was very much still in place and a concern. Let me ask you something. You assume that Landrigan is the clearly established Supreme Court authority that governs this issue, but wasn't Landrigan decided after the California Supreme Court issued its decision in this case? So the governing law would have been Strickland itself, right? Well, that's true. Landrigan was decided after. Landrigan also, the court stated that this is the first time we've ever addressed a situation such as this. So there was no Supreme Court precedent as to that aspect. So what law would you suggest we look to? Well, but in looking at Strickland, there also was no prejudice. And that's because if you're looking at, I mean first, this was a cold-blooded callous murder. This was an individual who had been taken in. I think you have to admit, or concede to some degree, that this is not the worst murder we've ever seen where there's been capital punishment. I mean there's, having been doing this for a long time now, I've seen a lot more egregious circumstances. I would absolutely agree. It's not the worst, but it's also not the meekest. And I would say that for the time period, it was extremely heinous. I mean this was, as I said, you know, an individual that was taken in by this motherly figure who provided housing, food, medical care, love. And this person waited in the home, Wade Law waited in her home with a hatchet. When she arrived, he bludgeoned her, shattering her larynx, breaking all the facial bones on the left side of her face, knocking her teeth out. And then after doing so, turned the hatchet around and plunged it so forcefully into her head that it penetrated her skull and carved back a flap of sculp and bone. So in light of that, compared to this unremarkable happy childhood evidence that Wade Law now suggests should have been presented, it simply cannot be said that he was prejudiced. This happy childhood evidence, I'm aware of no cases, nor has Wade Law cited any cases, that stand for the proposition or demonstrate a capital situation that has been changed based on this happy, positive upbringing that was presented. In fact, I would say that the presentation of such evidence would have made him more culpable. It would have made him more of a monster. When you not only take away the theme that was presented by trial counsel, which was that he was alone in the world without any love and any support, any friends, any family, except for this friend who dominated him and really was the main actor in this murder, but then to trot in these people that would have contradicted that theme, these people who counsel knew had not had much contact with Wade Law, but to bring in these people and present this happy childhood rather than this loner situation in light of the heinousness of the crime, there would not have been prejudice. Let me put this point to you and see what your reaction is. I think I at least tentatively kind of write where Judge Guilford ended up. He's a very careful judge, not one prone to grant habeas relief recklessly, and I think I understand why he landed where he did, and it has to do with the nature of the jury deliberations, and I'd love for you to speak to that, because speaking for myself, I'm kind of in your camp. I look at the mitigating evidence that trial counsel allegedly should have produced, and it's not the most compelling. Just as we've seen more heinous crimes, we've seen much more compelling mitigating evidence brought forward, but because the jury, we know to a certainty, I think, was on a knife's edge, at least one or more jurors, I think what Judge Guilford ended up saying was, look, what habeas counsel produced, it's not nothing, right? It is something. It does round out the picture of this person as a real human being as opposed to just some monster caricature, and when the jury was that evenly or that how could a reasonable jurist say that there is just no way that even this relatively modest quantity of mitigating evidence just would have made no difference? I think that's where he ended up, and I kind of see the logic of that position, so I'd love to hear your reaction to that. Sure. I don't think the district court asked the correct question. I think the district court, in looking at this cumulative analysis of prejudice, did not give ADPA the required deference that it deserved. I think that when you look at these three subclaims, when you look at the good behavior in jail subclaim, first, as I mentioned, he said it was a close call. Counsel, can I just ask you, do we really isolate each of these things into subclaims, or do we look at the totality of them? We should look at the totality, but I guess my point is that because it was a close call as to the first subclaim, that claim should not have been considered in the cumulative analysis of prejudice. Even if it was considered, this was not a skipper situation where future dangerousness was argued. In fact, the district court pointed out, the trial counsel argued reasonably well that Wade Law would not be a future danger. There was no prejudice by the failure to present the fact that he was programmed well in jail. Then, if you look at the Soviet Army evidence, that evidence was presented. The jury heard from the best source of that evidence, Wade Law himself. Not only did they hear from Wade Law, but they also heard from the victim's husband, who corroborated somewhat the horrible conditions that Estonians suffered in the Soviet Army. Because they heard that information, there also was no prejudice. So, when you're looking at this cumulative analysis... If I can just jump in, I completely disagree with your view of the mitigating evidence. I don't know how you're going to... You're not going to persuade me that habeas counsel basically came up with nothing. I think, as I said, I agree with Judge Guilford, it's something. It's not the most compelling set of mitigating circumstances that we've ever seen. But you haven't really addressed the question I put to you, which has to do with the jury deliberations. For nine days, the jury is struggling to come to a verdict. We know on at least two occasions they come back and tell the judge, basically, we're not going to be able to come to consensus. There's at least one of us, and maybe more, who are not going to vote for death. On the basis of what I would say to you is basically nothing in terms of mitigating evidence that was put on during the guilt phase. I mean, the trial judge's statement that there was some kind of a mountain of evidence is just absurd, just as Judge Guilford stated in his decision. So, just come back to that point. Because that's, to me, if this were the jury came back in three hours and said death, I might be with you. But given the struggles and the declaration, pretty adamant declaration, even in the face of a polling by the trial judge, that jury was deadlocked, I'm hard-pressed to see how we can just say, no, none of this would have made a difference because it was so close. And you haven't responded to that. So I just want to give you a chance to do so. I apologize. It was my long-winded way of getting to the final answer. And that is, it's at least debatable as to whether this evidence would have made a difference. And because it's debatable, Wade Law's claim fails. I think if you look at the jury deliberations, there's a lot of speculation involved. You say that in your brief, and I guess I just kind of laugh at that. What is there to speculate about? The jury says, we are deadlocked. There is at least one of us amongst the jury who is not voting in favor of death. So there's nothing to speculate about. Is there some other interpretation of that? The speculation is over what they were chewing on. I mean, it's entirely possible that they were struggling with the evidence that was given by trial counsel. And again, that was a theme that... Counsel, they're struggling as to whether to sentence him to death. The argument that your opponent has put forward is that they had essentially nothing in the way of mitigating evidence to round out the humanity, I think is the term they use, of this individual. They've come forward with something. You dismiss it as essentially of no value. And I'm just saying, I disagree with that. I think a fair-minded person looking at this set of evidence that State Habeas Council produced in 1999, it is something. It definitely tips the balance in his favor in a way that is different from what the jury heard during the guilt phase. So if you accept that, and I'm just saying that's where I'm at, how can you then say to a jury that was deadlocked after nine days of deliberations that this, we can just be fair-minded, jurists could come to that conclusion, precisely because the jury was basically an equipoise and a little bit more on the life-without-parole side, how would we know that that wouldn't have tipped the balance? Well, and I guess to answer your question, it's because I don't accept that. There was mitigation evidence presented. There was no additional mitigation evidence presented at the penalty phase, but there was mitigation evidence presented. And so, going back to my speculation comment, you know, it's unclear what was giving the jury pause. It very well could have been this presentation that trial counsel did give, and it's reasonable to suggest or argue that this new theme, this new presentation of evidence would not only have undercut what was presented, but very well could have actually caused more moral culpability for the crime. No, I just don't think that at all. Certainly. I mean, the jury would have been presented with evidence that Wade Law, who grew up in this positive upbringing, this happy environment, was then taken to America, put in another positive, happy environment, and what did he do? He struck out and he murdered the closest person that he had to him. So, I think that trial counsel, who had a duty to investigate, but also based on reasonable decision-making, could limit any further investigation, made a reasonable decision to present a different theme. And that theme was he did not have any friends or family in the United States, anyone that cared about him. He was under the domination by Sicarius. He was an immature individual. I think this is a compelling theme that he attempted to present, and I absolutely think it would have been undercut by the presentation of this new evidence, or this new theme, that Wade Law is now suggesting should have been presented. And again, I think at the very least, it's debatable whether it would have changed the tide. As far as Wade Law's suggestion that penalty-phase relief should be granted based on the prosecutor's misconduct, that suggestion should be rejected for the same reasons the District Court and the California Supreme Court rejected it. And that's because the evidence demonstrated that Wade Law himself levied six savage blows to the victim while Sicarius stabbed her four times, and the victim died from a combination of these wounds. So, as the California Supreme Court found, it can be said, beyond a could not have affected the penalty-phase verdict. Could I ask you to go back for a moment to the sort of good behavior in prison or in jail mitigating evidence? Because one of counsel's themes at the penalty-phase argument was that he, Wade Law, could teach other prisoners about his in jail have supported that? I mean, why wasn't it deficient not to develop that? Well, first, we don't know that defense counsel did not investigate that, and I think that's another error that the District Court made. The declaration by trial counsel, as the District Court acknowledged, said nothing about his investigation into good behavior. And I think that omission alone... But what about the statement at the end where he says, I did not investigate or develop any other mitigating evidence, apart from that which was presented at the guilt phase? It's a pretty categorical declaration. I don't know what ambiguity you're reading into that. I think that carefully crafted statement by legal counsel is not as certain as Wade Law makes it to believe. That's a sworn statement under oath by counsel. He does it in categorical terms. You try to say that there was some missing affirmative declaration, that he didn't look into this, he didn't look into that. He says what he did, and it was nothing beyond what was presented during the guilt phase. I think you can interpret that statement to mean different things, and I know that we are bound by ADPA, so we would not look at what happened at the evidentiary hearing. But there was an evidentiary hearing, and we know what came out. And what came out in that does contradict that statement, if it's to be read with such certainty. So to go back to the good behavior, because there was nothing in the declaration addressing the investigation or lack of investigation into this good behavior, Strickland says we must presume competence, and that's the exact opposite of what the district court did. The district court took that silence and presumed incompetence. So we don't know what counsel's steps were in investigation, and for that reason, that subclaim should fail as well. But even if we are to assume that counsel didn't investigate it, as Your Honor pointed out, he argued, as the district court recognized reasonably well, that he wouldn't be a future danger in prison, and the prosecution at no time argued differently. This was not some kind of situation, Skipper also was not an IAC claim, it was a trial error claim, but there isn't the same backdrop here that you had in Skipper, which was the prosecution hammering the fact that Petitioner would be a future danger in prison. It just simply can't be said that because the trial counsel didn't also point out that he programmed well in jail, that he was prejudiced. I guess I do have one sort of more basic question about your appeal in this case. And that is, as I understand it, the state has had an indefinite moratorium on executions for four years now. You've repealed your lethal injection protocol, are in the process of dismantling death row at San Quentin. So it seems like the order of the district court prohibits you from doing something that you have zero interest in actually doing. Why is entertaining an appeal of that order, in the state's view, an appropriate use of this court's resources? Well, although there is a moratorium on executions, the death penalty is still the state of the law in California. This appeal was filed prior to the moratorium being put in place. And depending on the next governor, the moratorium could be lifted. On the facts of this case, we believe that the district court got it wrong, and that's why we appealed. Thank you. You may reserve the rest of your time. Good morning, Your Honors. Marta Van Landingham, appearing on behalf of Taunoo Wade Law. And before I address some of the state's arguments on the IAC penalty claim, I would like to point out that, if possible, I would also like to spend some time discussing the other branches of the judicial system that failed Mr. Wade Law, that failed their duty to the Constitution. First, law enforcement, which interrogated Wade Law on his own after he clearly invoked his right to counsel. And second, the prosecution, which, even though it had initially determined that his uncounseled confession was likely inadmissible, and that Wade Law was not sufficiently culpable to be charged with the death penalty, later changed its mind as its better options fell by the wayside. And in its pursuit of justice, I'm sorry, in its pursuit of wins rather than justice, it then presented directly contradictory theories of defense at the two co-defendant separate trials, not just contradictory, but it manipulated the evidence knowingly and purposefully in order to make each separate defendant appear the ultimate killer and appear sufficiently culpable before each of their juries to merit the death sentence. So this was a basic, I know the term perfect storm is overused, but there were a lot of things that went wrong with this trial, in addition to trial counsel's own abject failure to conduct investigation in this case. I also want to add a little bit something to Judge Watford's point regarding the nine days of deliberation. That deliberation followed pretty closely on the four days of deliberation for the guilt phase, during which the jury requested to have the confession of Mr. Wade Law's statement read back and to have the transcript provided. And between that time and its deliberation on penalty phase, it had no new evidence presented in either mitigation or aggravation. So it was an unchanged series of facts that it was weighing in both cases. Now I should probably begin with the Landrigan issue and the clear distinction between that case and this one. In Landrigan, the court itself inquired directly of the defendant, his feelings toward mitigation, and he insisted on absolutely no mitigation of any sort. And he made it clear to the court that he would actually disrupt the proceedings should his trial counsel attempt to introduce any mitigation. Here you have Wade Law never prohibiting mitigation at all. He didn't know what mitigation really was. He was new to the country. Counsel, I at least agree with you that this is not very much like Landrigan. But why, at least with respect to the issue of contacting the defendant's family or friends back in Estonia, why isn't the concern that he expressed that Estonia at the time was still occupied by the Soviet Union, while the trial was going on, the Soviets sent tanks into Vilnius after the Lithuanian Declaration of Independence. Why wasn't it quite reasonable for counsel to respect the concern that the defendant expressed that contacting people there might put them in danger and so he shouldn't do that? Four things. First of all, he conducted no investigation to find out what the actual situation was. Second, had he done so, as Dr. Halevi-Rumet later told the state court, the situation was opening up. Soviet rule was weakening, was breaking throughout Estonia, and there was quite a bit of traffic back and forth by that point. Third, Peter Zacharias's counsel traveled to Estonia and interviewed family and friends and presented tape recordings of their interviews at Zacharias's trial at the same time. And fourth, Mr. Wadelaw provided his counsel with his uncle's phone number, and counsel later said he did try to call that number. So all of this about impossibility is clearly not the case. And there's also the fact that Wadelaw himself was actually corresponding with his uncle via a friend in Finland because he could travel easily back and forth from Finland with no problem whatsoever. And what, in your view, is it that the uncle or anyone else from Estonia would have said that would have been helpful? Well, the Disney version of an upbringing that has been discussed here was not correct. There is a much more well-rounded person in Tauno Wadelaw that should have been presented to the jury. His wasn't a perfect life. His mother and father gave him up a few weeks after his birth to pursue their careers. He was raised by his uncle and his grandmother, who developed a brain tumor and died horribly. His other grandmother and a couple of other close family members were killed in a house fire when Tauno was 14, and after that he fell into depression. But even with these circumstances, he always continued to display pro-social acts. He remained the whole thing about a good person. And it can affect the jury if they see that somebody, no matter what goes wrong in his life, remains a good person who works hard, who has achievements, who has friends and family who care about him very much. That does humanize him, and there are a number of cases that talk about how important that is. In Havana, there was a discussion about how the image presented of the client at trial was so different from what should have been presented. Why couldn't a reasonable jurist have thought that dwelling on his early life would be as much aggravating as mitigating, in the sense that you could view this as a rather unremarkable ordinary upbringing, with the significant exception that he was growing up in a country that was occupied by a totalitarian dictatorship. And then he has this extraordinary stroke of good fortune that he escapes it and finds freedom in the West, and he then squanders that by murdering someone with an ax. If you view it that way, dwelling on the early life doesn't really help very much. So why is that an unreasonable view, if that's the view that the State Supreme Court took? Well, you do have the jury deliberating for nine days. They were clearly torn, and all they knew about him had come from his own words, either on the stand or on the basis of this adventure story that he'd written for publication, with somebody else's help, by the way, long before. So they didn't know very much about him. Somebody else was the victim, right? Right, exactly. What they knew about him, a lot of that they discounted, because his testimony, which his trial counsel elicited knowing it was false, but basically the jury also knew it was false, in light of the statement that was played to them, the tape, under all the controls of a confession. So what they knew about him was all questionable. What they could have known about him would have made him a person worth saving. Without a contention. I'm 20 minutes in, and my number is there five minutes. Do you have any other questions on this, or shall I touch briefly on the Edwards or the prosecutorial? You're only 10 minutes. Oh. The clock goes backwards. Oh, so I still have 10 minutes at this point. You have 20 minutes. Oh, I have 20 minutes. Okay. Okay, good. So I can still pass on to the other issues, unless you want to. Let's see if there's anything here I want to, that I want to, absolutely. We can talk about the close call. Yes, the district court used the word close call in its opinion, but it found, number one, that, per Skipper, this sort of evidence was potentially powerful and easy to get, and in the context of no investigation, no other mitigation presentation, it would have been an easy element to add in a case in which there was two people who were potentially equally culpable. There were arguments to be made about who was more culpable, who was more dominating, and good behavior in prison would have gone toward that. Again, when there was nothing else, it would have been something very useful. So that's why the district court, even though it was a close call on this one subclaim, found that trial counsel should have presented that evidence, and especially when compiling the prejudice of all the subclaims together, which you do under Boyd v. Brown, that it all came in light of no investigation to constitute ineffective assistance. What's your response to the State's argument as to this component of the mitigating evidence, that the form in which it was presented to the State Supreme Court, it was just a bunch of inadmissible hearsay, and so a reasonable jurist looking at that could completely discount it in terms of trying to do the prejudice analysis? On the first step, under Duval, the State procedural ruling as to how petitions are to be presented, when they're presented they're to be supported by reasonably available evidence, and at that point it does include, actually, hearsay documents. Only later, if an OSC issues and a evidentiary hearing, does the evidence have to be admissible in court. So there's that, that on the initial presentation it can be declarations, and State cases that are very important on the subject, like Romero, do use hearsay declarations as part of their evidence. It is accepted. But also there's our argument that at the time of trial, trial counsel had subpoena power. He could have subpoenaed the actual officials involved, not just used their records. But second, these are business records, which might have been admitted under that hearsay exception. So there's a lot of ways around that. He could have subpoenaed, at the time, better sources of evidence. But as it was, it was sufficient to make the prima facie case for the California Supreme Court. Okay, well, maybe I can just ask you this. I think I know the answer based on our case law, but what I'm confused about is why, in this posture, the result of your winning results in a grant of relief, right, as opposed to some further proceedings so that the State could have a chance to test this hearsay and see whether it's reliable, see if there's countervailing evidence. Instead, in the posture we're in, we're somehow, I guess, supposed to just credit as true everything in there and say, oh, yeah, you're entitled to relief and the death sentence is vacated. There was a federal evidentiary hearing. Basically, it was proper to grant that federal evidentiary hearing because under Frans V. Hazy, well, a hearing is proper when a potentially meritorious claim has been diligently presented with all its facts to the State court, and the State court has denied a hearing, and 2254D has been met. So the court, the district court, found the CSC unreasonable on the State record enough to grant this hearing. During the hearing, trial counsel was asked about that evidence and said he didn't know why he hadn't presented more evidence. But also at that time, the State had the opportunity to either rebut the fact of the good behavior or to cross-examine trial counsel with regard to why he didn't do anything. But the district court disregarded all of that. I mean, he says in his opinion, I can no longer consider, I think it was Martina's case, evidence, and therefore, for the record, I'm disregarding all of that evidence. Yes, he did, which does show how strong the case for unreasonable determination below was. But this court can do what Frans V. Hayes says, which is to simultaneously find that both 2254D and 2254A have been met and grant relief without further hearings. And there are a number of cases, which I can list for you if you'd like, in which this court granted relief without further evidentiary hearings. No, I know they exist. I don't understand how they could be correct in this posture is what I'm saying. I understand in the context certainly where the State court has had a full evidentiary hearing, all of the evidence has been aired, both sides have been heard, and we have a complete record. I get that if the district court looks at it and says, yeah, okay, well, the State court was unreasonable on this set of facts to deny relief. I'm saying in the posture we're in, it's kind of a 12B6 dismissal, and you don't just assume that all of those facts are true. There would need to be further proceedings normally, in a normal case, to make sure that the evidence is what the plaintiff has alleged. And that just doesn't happen in this posture, and that's what I don't understand. I do think there was. The federal evidentiary hearing does fill that hole that you're looking at. It doesn't for the reason that Judge Wardlaw just gave. The district court just completely put it aside and said I am, and very explicitly said I am making this determination based solely on the 1999, not even whatever came in in 2001, right? The 1999 State Havens petition. That's it. That is the four corners of the record that I'm looking at, and I'm just saying here if that's the basis on which the district court granted your client relief, not granted some further proceedings to see, right? I mean, you were given an outright win on the penalty phase. That just strikes me as odd. But I agree with you that our cases seem to allow that. Yeah, and Frans V. Hazey states it explicitly that it is possible to simultaneously find that D has been met and then grant relief under A, that the same set of facts in this case, it would be primarily the state court facts could be used to make that determination. Plus here you could add in the facts deduced at the federal evidentiary hearing for further support in making the A determination. Shall I get to the other claims? With regard to the Edwards issue, the main thing I want to focus on is that in the state court, both at the trial court and at the CSC, and to some degree also with the district court, the problem is that they were looking at this as more of a Miranda issue than an Edwards issue. Miranda invoking the right to silence, in which case speech, becomes a lot more important. And so they looked at the assertion that Wade Law had spoken first as being a lot more determinative than it should have been. But Edwards, with the invocation of the right to counsel, requires that reinitiation only be made when counsel is present. And reinitiation can be an act. And under Innis, which is clearly established federal law here, the act is basically any action which is reasonably likely to elicit an incriminating response from the suspect. So what you've got here, and in Bradshaw, which is by the state court and by the state here raised as the similar case, it's not similar. Because in Bradshaw, he had been under interrogation, he had invoked counsel, and the interrogation was being ended by his transportation back to jail. In that circumstance, he basically opened the substance of the interrogation again, the suspect himself did. Here we have interrogation ended by the clear invocation of right to counsel. Mr. Wade Law taken to a holding facility two hours away. After a night there, he was brought back to the place where he'd initially been interrogated, brought back in handcuffs to where the detective waited for him, the detective from L.A., and basically asked, you're the detective, right? Why are you here? It was the act of bringing him back to the interrogation where the detective waited to interrogate him. Solely to interrogate him. That was the re-initiation. So why is bringing someone to a place where someone is sitting there and they don't say anything before the defendant or the suspect does? Why is that an act that is reasonably likely to elicit an incriminating response? Like just having him show up somewhere? I don't understand that. Well, Wade Law had invoked the right to counsel. He'd been given a phone book and taken away. He had not actually been provided counsel. Next thing he knows, he's being brought back into the interrogation room, handcuffed, where there's another detective waiting to talk to him. That's a description of it, but why is that reasonably likely to elicit an incriminating response? It doesn't seem likely to elicit much of anything at all. Normally the way you would elicit a response is by asking someone something, and I take in as to mean that there can be situations where you could invite in some nonverbal way a response to an implicit question, but I don't see the implicit questioning in just having a guy sitting there when he comes in. One of the cases talks about how you are not allowed to react as if nothing has been asked for, and from Wade Law's point of view, he had to ask for counsel. He said he wouldn't talk until he got counsel. He was not provided counsel, but yet he was brought back for another interrogation. So he must think, you know, he's a 20-year-old Estonian who's only been in this country a while. What is he going to think, but this right to counsel doesn't really exist. He doesn't know why he's been brought back. That to me, I don't know that that's the key fact, but it seems to me it's a very powerful fact against the position you're arguing here. You've tried to change the position now, I guess, or later he did, but at least as I understand it at the suppression hearing and during trial, he said, no, I had no idea why they brought me back here. So if he's just, I mean, for all we know, he could be brought back because, yeah, you're about to be shipped out to L.A. and these people have come to get you, and you're just, you know, we're just here to process you. But from his standpoint, I think I understand your argument a little bit better if he's brought back, told that you're going to be grilled by some LAPD detective and he's placed in an interrogation room across the table from the person. I think I understand that better, but as I understand it, he was not told that, and then the initial encounter he had was out just in, you know, an open area. I share your skepticism in that when Pietrantoni said that Wade Laub initiated the conversation by saying, you're that detective from L.A., I'm not sure I agree that that would really have been reasonable. But the state can't have it both ways. They can't both say he didn't know and yet he said, you're the detective from L.A., let me tell you everything you want to know. I think that that would be a reason not to find the detective credible, but he was found credible. And I don't think we are in any position, especially not as a federal habeas court, to declare that credibility finding unreasonable. So that's why I say I'm with you. How would your client even know to say, oh, if he hadn't been told something, right? But, I don't know, maybe he was told that the LAPD detectives have come to collect you and you'll be headed back, and so that's how he made the connection. But in any event, you have a credibility finding against you on that point. It seems to me that that kind of seals the deal against you. No, I think it seals, respectively, I think it seals the deal for us in that if we do accept that he knew Pietrantoni was a detective from L.A., that is what made it a clear reinitiation by law enforcement. If it had just been some guy, then speaking to him, you can't possibly argue that he reinitiated rather than law enforcement. Well, Detective Pietrantoni was deemed credible. Right. And he did testify that after Wade Law made those initial comments, he gave them the Miranda warnings. I mean, wasn't that part of his testimony? Yes. However, that is after the reinitiation, and under Edwards, any further Miranda warnings are involuntary, and any further statement are inadmissible. And the DA agreed with all that. Remember, they initially found that it was likely to be inadmissible, and they weren't initially planning on using it. Okay, now you have, like, six minutes left. So that's your rebuttal. So you can use it now or you can use it later. I will use it later. Thank you very much. Thank you. Just a few points that I'll make in response. First, trial counsel was not duty-bound to surmount all obstacles or perform anything and everything that was possible. He was duty-bound. Well, first, the scope of his duty was defined by Wade Law's conduct, but he was duty-bound to make investigations or reasonable decisions that limited or rendered certain investigations unnecessary. And that's precisely what occurred here. Counsel was aware of this tenuous relationship with his family back home. He was certainly aware of the strife going on in Estonia. So it was entirely reasonable for him to choose what he chose to do, and that was present the theme of this loner in the world without anybody. As far as the article, as it was pointed out by Your Honor, it was written with the help of the victim. And, really, his plight or his experience in the Soviet Army went unrebutted, unrefuted. The prosecutor did not challenge the veracity of the allegations or the assertions in this article that he wrote. As far as the failure to meet California's pleading requirements, the report that has now been proffered from CDCR records is not a declaration. It is inadmissible hearsay. I mean, there's two signatures or two initials on the report. It's unclear who the author even is. So for those reasons, that hearsay would have been rejected by California on habeas. Well, your opponent's argument, I think, is that at essentially the pleading stage, that under California law, that is enough to get past just a summary denial. And so if the district court determines that, well, this should have been credited, at least for purposes of allowing the claim to advance, the state court's decision to just summarily reject it, kind of the district court in a position to assess the evidence anew. And I don't know what we're to make of what happened at the federal evidentiary hearing. But anyway, maybe you can respond to that. Well, I would disagree with that. I mean, I think Duval is clear that the California Supreme Court does not consider conclusory or hearsay allegations. I think declarations that are sworn under penalty of perjury are another matter. But as for this report, this, again, this report, it's unclear who even authored it, but it would have been rejected along with the self-serving declaration that Wade law offered. And as Your Honor pointed out, the evidentiary hearing was the opportunity for them to prove their allegations. But in fact, at the evidentiary hearing, they not only did not prove their allegations, but the result of the evidentiary hearing, their claims suffered. In fact, there was testimony that came out from trial counsel that undercut each of the subclaims of their penalty phase and effective assistance claim. So based on what was presented, even if that evidence had been considered, that supports the reasonableness of the rejection of those claims. And just responding to the one guilt phase claim. Before you get to that, can I just ask you, I mean, this has been raised in a couple of questions already, but do you, I just want to be sure, do you agree with the general principle that the fact that the jury was out nine days and that they, you know, at one point they said that they were deadlocked, that that is at least relevant to the assessment of prejudice? In light of the fact that the standard is whether one juror would have changed their mind, yes, I think it's relevant to the analysis. But I think it's relevant in the context that there has already been a reasoned decision made as to this question. And so the question really must be, is there any, can it be said that no fair-minded jurist would disagree with the conclusion that Wade Law now suggests? And my answer would be no. As for the Edwards-Miranda claim, in this it's inapplicable. Movement does not equal interrogation. The California Supreme Court reasonably relied on Oregon v. Bradshaw to recognize that it was Wade Law that initiated this conversation prior to the interrogation. The detective was not waiting for Wade Law to come out. The testimony at the hearing, which has been noted, there was a credibility finding made. The trial court found that the detective was credible. But the detective testified that he was actually in this room looking through a drawer for, I think, items that were seized from Wade Law when he was arrested. And he did not expect Wade Law to come up and interact with him the way he did. So I think the court was entirely reasonable when it concluded that Wade Law had initiated this conversation. If there's anything else, I would ask this court to reverse the district court's penalty phase ruling as to ineffective assistance and relief, but otherwise affirm the order. Thank you. Okay. Thank you, counsel. Van Lunningham. I want to point out that in aggravation, the DA presented not only the facts of the crime itself, but the lack of mitigation as an aggravating factor. He basically argued that the lack of an argument for life equaled an argument for death. And in addition... Where did he say that? He didn't say those words exactly. That's my... But he definitely argued that the lack of mitigation was in itself aggravating. Lack of mitigation evidence? Excuse me? You're saying he argued that the lack of mitigation evidence was aggravating? Correct. I have too many notes. I can review the argument. I can send that to you. The argument's not that long. I can review the transcript. Go ahead. Maybe my co-counsel can find it while we spoke. But then the other thing he presented in aggravation was Wade Law's Through the Fog article he wrote. The DA introduced it to the trial. And during his closing, he repeatedly cited to it as showing that Wade Law was a deserter, disloyal to his country, ready and willing to engage in criminality to get his way, even though these criminal acts were things like stealing clothes as they went through the cold of East Germany at night, trying to evade capture by the Soviet forces. So it was not intended to be mitigating, and actually Wade Law's counsel himself, his only citation to that account in his closing was to mention, you have been told he was a deserter, but, you know, blah, blah, blah. So there it is. Well, I mean, if your claim is that he should have done more with it, I mean, that seems less like a failure to develop evidence claim and more like a, you know, he didn't structure his closing argument very well. I mean, so, like, I guess what is there about the time in the Soviet Army and his escape from East Germany that wasn't in Escaping Through the Fog that should have been developed? Are you saying he should have developed something else? Yes, in that by the DA's presenting him as a deserter, he made him look sort of like a draft dodger, what the jury would have understood that way. If he had presented the context, if he had investigated what was actually going on in the Soviet Army at that time, he would have had all sorts of corroboration from people other than Wade Law about how bad it really was, about how likely it truly was that Wade Law could be killed or raped or beaten and had been badly mistreated. And that would have shown that his escape was a desperate attempt to live. Trial counsel could have found the letter that Wade Law wrote to his uncle basically saying, I'm going to kill myself before they do it to me. There was a lot more he could have found that would have made the story actually compelling to the jury. But, I mean, a lot of that was already in the story, right? And the jury had no reason to doubt the story, right? It was written by him well before any of this happened. And so far as I'm aware, the prosecutor didn't suggest that those aspects of the story were untrue, did he? He mischaracterized them as showing criminality and desertion. Right, but that's how you interpret the events, obviously. You can draw different interpretations from them, but he didn't say that none of those things actually happened, did he? No. But there's also one other thing I wanted to throw in that's not in our pleadings, I don't think, that there's no real indication that the jury actually ever read it directly. They were sent back. It was not read to them at the trial. They were sent back with this 41-page, badly typewritten, badly edited version of it, and they were never even actually instructed to read it themselves. So their only version of the story, really, we're sure, came from the DA. But, again, that's not a failure to develop evidence. Defense counsel should have talked about this more at a closing argument, right? Yeah. Had he corroborated and presented parts of it through mounts other than Wade Law's, which Wade Law's words were, by that point, already quite suspicious to the jury, it would have made it better. Can I quickly touch on the declaration, good behavior, supporting evidence, just to mention that if the California Supreme Court had denied the claim on the basis of the hearsay declarations, its usual practice is to cite to swain when it believes that the supporting evidence is a conclusory or unacceptable. And it didn't in this case. It just denied on the merits. All right. Thank you, counsel. I want to thank both counsel for an excellent argument today and for appearing in person. It's nice to actually argue a case in person and thank Judge Miller for coming in person today, too. Judge Watford and I are based here. And Wade Law v. Davis will be submitted. Would you like the citation, too? If you have it right now, sure. It's star 447. Thank you. No evidence of any of the actions of Mr. Wade Law. Thank you, counsel. All rise. This court for this session stands adjourned.
judges: WARDLAW, WATFORD, MILLER